# In the United States Court of Federal Claims

No. 11-153C

(Filed Under Seal: October 16, 2017 | Reissued: October 31, 2017)[*]

|  |  |  |
|---|---|---|
| CONFIDENTIAL INFORMANT 59-05071, | ) ) ) | Keywords: Summary Judgment; RCFC 56; Motion to Dismiss; RCFC 12(b)(1); Confidential Informants; IRS Reward Agreements; Anticipatory Repudiation; Duty of Good Faith and Fair Dealing; Accounting. |
| Plaintiff, | ) ) |  |
| v. | ) ) |  |
| THE UNITED STATES OF AMERICA, | ) ) |  |
| Defendant. | ) ) |  |

*T. Scott Tufts*, Tufts Law Firm, PLLC, Altamonte Springs, FL, for Plaintiff.

*Sheryl L. Floyd*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, for Defendant, with whom were *Franklin E. White, Jr.*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Chad A. Readler*, Acting Assistant Attorney General.

## OPINION AND ORDER

**KAPLAN, Judge.**

In [***], the plaintiff in this case, Confidential Informant 59-05071 (CI or "Plaintiff"), entered a contract with the Internal Revenue Service (IRS) in which it[1] agreed to supply the IRS with information about an alleged [***] tax evasion scheme used by [***]. In exchange, the IRS agreed that if it recovered any taxes based on Plaintiff's information, it would provide Plaintiff a

---

[*] This Opinion was originally issued under seal on October 16, 2017, and the parties were given the opportunity to request redactions. Both parties did so. Plaintiff, in particular, requested redactions where the Opinion discussed: 1) the topics of Plaintiff's disclosures and the dates of relevant events; 2) the names of individuals involved in the case; 3) the specifics of the IRS's investigation; and 4) geographical references specific to Plaintiff's information or the IRS's investigation. Out of an abundance of caution with respect to the protection of Plaintiff's identity, the Court has redacted the majority of the text identified by Plaintiff and the Opinion is now reissued, with redactions of potentially sensitive information indicated by brackets.

[1] To protect Plaintiff's identity, the Court will use the impersonal pronoun "it" to refer to Plaintiff.

monetary reward based on a percentage of any net tax liabilities recovered. It also agreed to protect Plaintiff's identity from disclosure.

After Plaintiff supplied the IRS with the relevant information, however, the IRS attempted to persuade Plaintiff to renegotiate the reward agreement on terms less favorable to Plaintiff. In fact, according to Plaintiff, the IRS threatened not to investigate the alleged [***] scheme and to close the matter unless Plaintiff agreed to modify the agreement. Ultimately, after Plaintiff refused to renegotiate the agreement, the IRS agent assigned to the case stopped responding to Plaintiff's communications seeking to learn about the status of any investigation.

The IRS, nevertheless, did conduct an investigation based on the information Plaintiff supplied, but decided that no enforcement action was warranted. Further, according to the IRS, it never collected any taxes in connection with the investigation. But the IRS never advised Plaintiff that it had conducted an investigation or that the investigation had been closed. Nor did the IRS advise Plaintiff that it had been "deactivated" as an informant. Plaintiff did not learn of the investigation or deactivation until after this suit was filed and discovery conducted.

In this action, Plaintiff alleges that by threatening not to investigate Plaintiff's disclosures unless Plaintiff acquiesced to a new agreement, the IRS engaged in an anticipatory repudiation of its obligations under the contract. Plaintiff also contends that the IRS violated the implied duty of good faith and fair dealing in its administration of the contract. Finally, Plaintiff seeks an accounting of the results of the IRS's investigation, which Plaintiff claims it is entitled to receive under the contract.

Pending before the Court is the government's motion for summary judgment and/or to dismiss with respect to all three counts of Plaintiff's complaint and Plaintiff's motion for summary judgment with respect to its third count seeking an accounting. Plaintiff has also filed a number of other motions asking the Court to take judicial notice of certain documents, to grant relief from the protective order, and to provide for additional, limited discovery.

For the reasons set forth below, the government's motion to dismiss for lack of subject matter jurisdiction is **GRANTED** with respect to Count III, and its motion for summary judgment is **GRANTED** with respect to Count I and Count II. Plaintiff's motion for partial summary judgment is **DENIED**. Further, Plaintiff's motion for the Court to take judicial notice is **DENIED**, its motion for relief from the protective order is **GRANTED**, and its motion for judicial notice and limited discovery is **GRANTED-IN-PART** and **DENIED-IN-PART**.

## BACKGROUND

The background of this case has been discussed in several previous decisions. Confidential Informant 59-05071 v. United States, No. 11-153C, 2016 WL 3960442 (Fed. Cl. July 21, 2016) (denying Plaintiff's motion for sanctions for alleged spoliation); Confidential Informant 59-05071 v. United States, 121 Fed. Cl. 36 (2015) (denying-in-part and granting-in-part Plaintiff's motion to compel); Confidential Informant 59-05071 v. United States, 108 Fed. Cl. 121 (2012) (same); Opinion, Confidential Informant 59-05071 v. United States, No. 11-153C (Fed. Cl. Nov. 22, 2011), ECF No. 16 (denying government's motion to dismiss). What follows is a recitation of the facts supported by the evidentiary material that the parties have submitted in

connection with the pending motions for summary judgment. Where a fact is in dispute, it is noted.

## I.     The Reward Agreement

Sometime in early [***], CI, through current counsel, advised the IRS that it possessed detailed information about what it alleged was a tax evasion scheme then being employed by [***]. See Decl. of CI in Supp. of Pl.'s Mot. for Summ. J. & Opp'n to Def.'s Mot. for Summ. J. (CI's Decl.) ¶¶ 1, 5, ECF No. 182; see also Pl.'s Am. Cross-Mot. for Summ. J. as to Count III and Opp'n to Def.'s Mot. for Summ. J. (Pl.'s Mot.) at 2, ECF No. 188-1. In [***], CI's counsel then met with representatives of the IRS's Large and Mid-Size Business division (LMSB). See Pl.'s Proposed Findings of Uncontroverted Facts in Supp. of Pl.'s Mot. (Pl.'s Findings of Fact) ¶ 8, ECF No. 185.[2]

Some fourteen months later, on [***], the IRS and CI (again through counsel) executed a Confidential Informant Reward Agreement (the "Reward Agreement"). 3d Am. Compl. Ex. A, ECF No. 137-2; see also CI's Decl. ¶ 2. Pursuant to the Reward Agreement, CI was to "provide information and evidence in a written form concerning individuals and entities . . . who were (and perhaps still are) either directly or indirectly involved in [***]." 3d Am. Compl. Ex. A at 2. The Agreement recited that CI "ha[d] sincere concerns for his or her safety, fear of retaliation, even litigation[,] and desire[d] protection against inadvertent or intentional disclosure of his or her identity," and included a series of provisions intended to protect CI's identity. Id. at 2–4. Among other things, the IRS agreed that "[n]o unauthorized person [would] be advised of the identity or the existence of [CI]," and that it would "adhere to the guidelines set forth in its Internal Revenue Manual regarding the protections given to informants in criminal investigations." Id. at 2.

Additionally, the IRS agreed that it would "pay [to CI] a sum equal to" certain specified percentages of any "net tax liabilities . . . collected as a result of information or documentation supplied by [CI]." Id. at 4. Specifically, the IRS would pay CI twenty percent of the first $5 million in net tax liabilities recovered, and twenty-five percent of any net tax liabilities recovered above $5 million, "provided that the total amount to be paid shall in no event exceed $35,000,000 and that no payment shall be made if any of the conditions set forth in this Agreement are not met." Id.[3]

---

[2] The government does not dispute that at some point in [***], Plaintiff's counsel met with the IRS. Def.'s Counter-Statement to Pl.'s Corrected Proposed Findings of Uncontroverted Fact at 8, ECF No. 196. CI provides no record citation, however, for its assertions regarding the substance or purpose of the meeting, and the government disputes the same.

[3] The agreement's reward percentages and reward cap were above the levels set forth in IRS policy; accordingly, [***], the Commissioner of LMSB, was required to obtain a waiver of Service Policy Statement P-4-86 from the Deputy Commissioner of Internal Revenue, [***]. See Decl. of T. Scott Tufts in Supp. of Pl.'s Mot. (Tufts Decl.) Ex. EE, ECF No. 183-8. In recommending the waiver, [***] advised that Revenue Agent [***] of LMSB had already met

In the agreement, CI "waive[d] the right to file a claim for a reward on Form 211, Application for Reward for Original Information." Id. at 7.[4] Further, CI and the IRS agreed that "[n]o modification of [the] Agreement [would] be effective unless in writing and signed by the parties." Id. at 8. The Reward Agreement was signed by counsel for CI on CI's behalf and by [***] of LMSB. Id. at 9.

## II.    CI Provides Information to LMSB

On [***], CI's counsel met with representatives of LMSB and provided information on the alleged tax evasion scheme pursuant to the Reward Agreement. CI's Decl. ¶¶ 3–5; Def.'s Mot. for Summ. J. (Def.'s Mot.) App. at 3, ECF No. 176-1. This information primarily related to the years [***] through [***]. CI's Decl. Ex. 1, ECF No. 182-1. CI alleged that [***] was engaging in [***], among other things, amounting to at least [***] per [***] per year. Tufts Decl. Ex. G at 11, ECF No. 183-2. CI asserted to the IRS that the principals behind [***] were [***]. Id. at 13. It also identified a number of individuals involved in the operation of the scheme and their roles in [***]. E.g., id. at 23. Further, CI alleged that [***]. Id. at 24. The presentation also explained CI's understanding of how the [***] occurred and provided [***]. See id. at 59–73.

## III.    The Information is Referred to the IRS's Criminal Division

The record is not clear as to what, if anything, LMSB did with Plaintiff's information.[5] In any case, in early [***], LMSB referred the matter to the IRS's Criminal Investigation division.

---

with CI's attorney and "made the assessment that . . . the information would be valuable to the Service in collecting unpaid taxes." Id.

[4] Form 211 is a standard form that an informant may complete after supplying information about alleged violations of the tax laws. It is used as the basis for requesting a monetary reward from the IRS under 26 U.S.C. § 7623. See Capelouto v. United States, 99 Fed. Cl. 682, 690 (2011). The current version of § 7623 provides, in relevant part, that if an individual provides information to the IRS that results in the detection of a tax underpayment or the prosecution of a tax law violation, that person "shall . . . receive as an award at least 15 percent but not more than 30 percent of the collected proceeds . . . resulting from the action . . . or from any settlement in response to such action." 26 U.S.C. § 7623(b)(1). At the time that Plaintiff provided information to the IRS, however, the provision of an award under § 7623 was entirely discretionary. See 26 U.S.C. § 7623 (2000) (stating that the IRS was "authorized to pay such sums as [it] deem[ed] necessary" to persons providing information); Colman v. United States, 96 Fed. Cl. 633, 638–39 (2011) (analyzing the language of the prior version of § 7623).

[5] In one email composed after the matter was transferred from LMSB to the IRS's Criminal Investigation division, Special Agent (SA) [***], the IRS's [***] Area Undercover Program Manager (UPM), stated that "[f]or whatever reason, LMSB was unable to make any head way on the case." Def.'s Mot. App. at 3. In another, he observed that "LMSB for whatever reason [did] nothing with the CI from [***]." Pl.'s Mot. for Order to Compel Discovery from Def. & for Sanctions (Pl.'s Mot. to Compel) Ex. K, ECF No. 98-1.

See Def.'s Mot. App. at 3. On [***], SA [***] of the Criminal Investigation division met with both CI and CI's counsel, at which time CI revealed CI's identity to SA [***] (and thus, for the first time, to the IRS). See Def.'s Mot. App. at 343 (CI's Deposition at 87). Further, according to CI, it provided additional information to the IRS at this meeting "regarding . . . [***]." Id. at 344 (CI's Deposition at 91).

At some point after the Criminal Investigation division received the case from LMSB, the parties began to discuss possible modifications to the Reward Agreement. See CI's Decl. Ex. 8. According to a memorandum prepared by SA [***] on [***], although CI had initially been "unwilling to disclose his/her true identity," CI "had a change of heart" earlier in the year. Id. Thereafter, SA [***] noted, "[c]ontact was made with [CI's] attorney, Scott Tuft[s], who informed us that he/she was willing to let their true identity be known and assist IRS-CI in any manner including wearing a wire and the introduction of an Undercover Agent." Id.

As a result, counsel for CI engaged in negotiations about amending the Reward Agreement with the same IRS attorney who had negotiated the original agreement on the IRS's behalf. See id. In addition to negotiating language to amend the Reward Agreement to reflect Plaintiff's willingness to wear a "body wire," the parties agreed upon language that substituted the tax years [***] for the tax years [***] referenced in the preamble to the Reward Agreement, and changed the IRS's designated contacts to SA [***] and SA [***]. See 3d Am. Compl. Ex. B, ECF No. 137-3. Plaintiff signed this amendment on [***], and Plaintiff's counsel submitted it to the IRS the next day. See id.[6]

On [***], UPM [***] offered his opinion about the proposed amendment and the original Reward Agreement in an email to Supervisory Special Agent (SSA) [***], on which he copied SA [***] and others at the IRS. See Def.'s Mot. App. at 2–3.[7] He observed that he did not "want to be a fly in the ointment here," but that "the [***] [agreement], which I assume is still binding to the agency, has some issues that Criminal Investigation should be aware of." Id. at 3. He opined that the procedures for protecting CI's identity generally were "over the top to the point where it looks like the informant may be setting us up for some legal action down the road when [its] identity gets revealed." Id. In particular, he cited the provisions in the Reward Agreement which provided that "no unauthorized person will be advised of the identity or the existence of

---

[6] Both parties take the position that the Reward Agreement was modified by the amendment that Plaintiff signed. 3d Am. Compl. ¶ 20, ECF No. 137-1; Def.'s Mot. at 4 n.4, ECF No. 176. The government, however, asserts that "[n]o government representative ever executed the modification to the Reward Agreement," Def.'s Mot. at 4 n.4. Further, CI does not have a copy executed by the government. 3d Am. Compl. ¶ 21. Moreover, as discussed below, the IRS continued to discuss additional modifications to the Reward Agreement—both internally and with CI—after CI signed the amendment on [***].

[7] UPM [***] served as an "advisor" who went "between the field, the agents and headquarters to assist and provide oversight of the undercover program." Def.'s Mot. App. at 32 ([***] Deposition at 8). The Undercover Program Manager is "not a decision maker," but rather ensures "that the operations are carried on with the rules that the agency prescribes." Id. at 41 ([***] Deposition at 41–42).

the informant," that "no IRS official will intentionally disclose the Informant's identity or the existence of the informant unless required to do so by law or ordered by a judge or magistrate to do so," and that "at no time shall the IRS act in such a way as to place the informant in a position where he or she might become a witness or unnecessarily identified in a court proceeding without his or her consent." Id. Additionally, he expressed concern about the size of the overall reward cap, which was $35 million. Id. "When we are talking these kind of numbers," he observed, "we'll want to get a buy in from the Chief and HQ before agreeing to these terms."[8] Id.

Based on these concerns, UPM [***] recommended that the IRS "start over with a new [agreement], preferably one[] like the go-by's on CASE," a sample of which he attached to his email. Id. He recommended that the new agreement be reviewed and approved by IRS legal counsel. Id. He also observed that "[n]ormally, the SAC is the person who signs on behalf of IRS," but that "[i]n this instance, based on the potential payout, the Chief should be brought in the loop and direct [who should sign the agreement]." Id. Finally, UPM [***] recommended that the IRS criminal division not "do anything proactive with the CI until the new agreement is in force." Id. Instead, he recommended that "[t]he case agent . . . prepare a brief two page executive type summary of the information the CI is bringing to the table, what he/she is willing to do, and where they see this case/potential undercover operation going." Id. He closed his email by noting that "[m]aybe I've gone over the top with my recommendations and there is an easier way to do this. If there is, then feel free to make it happen." Id.

Four months later, on [***], SSA [***] emailed SA [***] in follow-up to UPM [***]'s [***] email. Id. at 2. She asked SA [***] to "please look at [***]'s email again" and stated that she "need[ed] a[] [draft agreement] and 2 page summary. . . . by COB tomorrow so we can get this going." Id. SA [***] submitted a draft of a new agreement along with his case summary to SSA [***] on [***]. Id.; see also Pl.'s Mot. to Compel Ex. D (the summary memorandum). Among other things, SA [***] wrote that "CI ha[d] provided a wealth of information that more than indicate[d] that the [***] have been engaging in tax fraud for over ten years." Pl.'s Mot. to Compel Ex. D. He observed that the "case would be a difficult case to make without the CI, but believed not to be impossible." Id. He then described the investigative processes that would be required to "make" the case without CI. Id. SA [***] also commented that the [***] may have been using an "[***]" and that this [***] "may be [***]," and thus the "case could generate national publicity and fits squarely into the legal sector income that is emphasized in the FY [***] ABP." Id.

SSA [***] forwarded SA [***]'s draft agreement and summary memorandum to UPM [***] on [***]. Def.'s Mot. App. at 1. She asked him to "advise if you think he needs to add anything else before it goes forward." Id. In response, on [***], UPM [***] wrote that the case "looks like [it is] probably going to be a tax case." Id. He recommended "includ[ing] language as to IRS's standard policies regarding reward payments to informants via Form 211" in the proposed new agreement. Id. UPM [***] stated that they did not "need to reinvent the wheel"

---

[8] The "Chief" was a reference to the head of IRS criminal investigations in Washington, DC. See Def.'s Mot. App. at 33 ([***] Deposition at 11). The record does not reflect whether or not UPM [***] was aware that the Reward Agreement had already been approved by the Deputy Commissioner of Internal Revenue. See Tufts Decl. Ex. EE.

and advised SA [***] to "just take the language verbatim from the [Internal Revenue Manual] . . . and include in the [agreement]." Id. He also stated that after SA [***] made these revisions, they "need[ed] to obtain approval from [IRS legal counsel] before tendering to the CI or [its] attorney." Id.

According to CI, SA [***] had actually been attempting to convince CI to use a standard Form 211 in lieu of the Reward Agreement as far back as their in-person meeting in [***], shortly after the IRS Criminal Investigation division received the case from LMSB. See id. at 352 (CI's Deposition at 122–23). SA [***] repeated this effort to convince CI to sign a Form 211 in lieu of the Reward Agreement at an in-person meeting in [***]. Id. CI also asserts that SA [***] continued these efforts on the phone between [***] and [***]. Id. at 351–52 (CI's deposition at 121–23). CI alleges that SA [***] "threaten[ed] not to pursue the case unless [CI] g[a]ve in to the form 211." Id. at 353 (CI's deposition at 127–28). CI also claims that SA [***] disparaged its counsel during this period of time, and allegedly blamed its counsel for "[tying the IRS's] hands." CI's Decl. ¶¶ 42–44.[9]

Following UPM [***]'s [***] email, SA [***] continued in his attempts to convince CI to modify the Reward Agreement to address UPM [***]'s concerns. On [***], SA [***] emailed CI a number of sections of the Internal Revenue Manual as well as a blank Form 211. CI's Decl. Ex. 9. In his email, SA [***] stated that he had "[a]ttached . . . the applicable form and the relevant rules and regulation[s] that apply in [CI's] situation." Id. He also stated that the "information [was] available in the public domain" and that if CI had questions, CI should call SA [***]. Id.

CI, however, rejected SA [***]'s requests and refused to sign a Form 211 to replace the Reward Agreement. See Def.'s Mot. App. at 352–53 (CI's deposition at 122, 126–27); see also CI's Decl. Ex. 10. Thus, on [***], CI responded to SA [***] by email, stating that "[a]fter careful[] review . . . I have to reject your suggestion of using [the] standard form in lieu of [the] existing agreement." CI's Decl. Ex. 10. CI did, however, express a willingness to work with the IRS on lowering the cap on CI's reward payment "if money is the only concern." Id.

In [***], SA [***] forwarded to CI another proposed amendment to the Reward Agreement. See Def.'s Mot. App. at 355–56 (CI's deposition at 134–41). The newly-proposed amendment, like the amendment CI had signed in [***], would have altered the tax years referenced in the preamble to the Reward Agreement, confirmed CI's willingness to wear a wire, and changed CI's points of contact at the IRS. CI's Decl. Ex. 11. In addition, and consistent with UPM [***]'s suggestion, the new proposal would have replaced the provisions of the Reward

---

[9] In its declaration, CI states that during this period of time, beginning on [***] and continuing through at least [***], it was without legal representation. CI's Decl. ¶ 41. The [***] date appears to be inaccurate; as noted above, Plaintiff signed an amendment to the reward agreement on [***], which Plaintiff's counsel submitted to the IRS the next day (i.e., [***]). Notwithstanding this apparent discrepancy, the Court understands CI to be claiming that it was not represented by counsel during the period of time when SA [***] was allegedly disparaging CI's counsel and attempting to persuade CI to substitute a Form 211 for the existing Reward Agreement.

Agreement regarding the protection of CI's identity with a one-line reference to the then-current Internal Revenue Manual sections regarding the protection of the identities of confidential informants. Id. It also would have replaced the reward payment provisions with a requirement that the IRS pay CI any reward in accordance with the Internal Revenue Manual. Id.

CI declined to sign this proposed amendment. See Def.'s Mot. App. at 356 (CI's deposition at 138–40). Thereafter, according to CI, SA [***] continued to tell CI that if CI did not sign the proposed amendment or a Form 211, the IRS would not pursue a case based on the information CI had provided. Id. (CI's deposition at 141).

In [***], SA [***] finalized an "executive summary" of his [***] memorandum and submitted it to SSA [***]. Pl.'s Mot. to Compel Ex. E. The executive summary presented the same information as the earlier memorandum, but in an abbreviated fashion. See id. It included SA [***]'s observation that CI had provided a "wealth of information" supporting its allegations of tax fraud, as well as SA [***]'s conclusion that the case would be difficult but not impossible to make without CI. Id. In addition, SA [***] again wrote that there was a possibility that an [***] supported the [***] scheme, and noted that positive publicity could be generated by breaking up the scheme. Id.

After receiving SA [***]'s summary, SSA [***] emailed Special Agent in Charge (SAC) [***] on [***]. CI's Decl. Ex. 14, ECF No. 182-3. In her email, which attached the original Reward Agreement, she explained that "[SA [***]] has been working with the CI and UPM [***] to revise this contract because of the limiting language that it contained which involved how the CI would be potentially utilized." Id. She observed that "[i]nitially the issue is that the entire contractual agreement should be null and void and the CI should work under the constraints of a Form 211." Id. She explained, however, that "[t]he CI does not want to sign the form and feels that the modification language" in a newly-proposed amendment also attached to SSA [***]'s email "should be sufficient."[10] Id. This new proposal again would have extended the tax years referenced by the preamble to the Reward Agreement and provided that CI would be willing to wear a wire in certain circumstances. Id. Under this proposal, however, the existing identity protection and reward payment provisions of the Reward Agreement would remain, but the recovery cap would be adjusted downward from $35,000,000 to $15,000,000.[11] Id.

Finally, SSA [***] noted that "[a]s of [***] this PI will have 10 months and over 300 hours—we need to take some sort of action quickly on this." Id. Accordingly, she stated that:

> Should you and [***] feel that you don't want to forward the attached contractual amendment for review let's discuss in order to come up with an[o]ther strategy. Both SA [***] and myself think it is critical to get the participation of the CI who is willing to make

---

[10] The origins of this newly-proposed amendment are unclear from the record.

[11] As alluded to above, in the [***] email to SA [***], CI had already indicated a willingness to "be flexible" regarding the "cap" if money was the IRS's concern regarding the Reward Agreement. CI's Decl. Ex. 10.

> introductions for a potential UC meet with the principles [sic] but
> understanding that this all adds time with no guarantee for success—
> this may also be able to be worked under the [***] project. The plan
> is to gather enough info to do a SW on the main location where the
> books and records are stored.

Id. She concluded that "if we are not able to utilize the informant, then SA [***] will number straight up as Title 26—but that may also be a stretch to be successful with." Id.

## IV.     The Criminal Division Conducts an Investigation of the Alleged Tax Evasion Scheme

The record does not indicate whether SAC [***] responded to SSA [***]'s email or what became of the new amendment she forwarded to him. See CI's Decl. ¶ 47. But it is undisputed that in the months after SA [***] wrote his executive summary and SSA [***] sent her email, SA [***] stopped responding to CI's emails and other communications. See Def.'s Mot. App. at 360–61 (CI's deposition at 157–61). Thus, in a [***] email, CI wrote to SA [***] that "[i]t ha[d] been 3 years from the date [CI had] submitted [***] evidence[] to [the] government" and that CI was "very disappointed that nothing gets done." CI's Decl. Ex. 16 at 1. CI also wrote that they did not "have one or two more years for a new agreement." Id. SA [***] did not respond. Def.'s Mot. App. at 360 (CI's deposition at 157).

Three months later, in [***], CI emailed and sent a letter to SA [***] inquiring as to whether any "progress" had been made in the IRS's investigation of the tax evasion scheme. Id. (CI's deposition at 156–57). Because SA [***] did not respond to these communications, CI sent him a letter via certified mail in [***]. Id. at 360–61 (CI's deposition at 157–58); see also CI's Decl. Ex. 21. In this letter, CI wrote that because CI had "not received any response from" SA [***] to CI's recent emails and letter, CI was inquiring as to "whether any progress on the case has been made or whether [SA [***]'s] department had already decided to drop the case." See CI's Decl. Ex. 21. CI asserted that, in its view, it had a "right to receive reports on the case" and that SA [***] also needed to return to CI nine volumes of [***] from [***] that CI had lent him. Id. CI stated that it looked forward to hearing from SA [***]. Id.[12] SA [***], however, never responded to CI's certified letter. Def.'s Mot. App. at 360–61 (CI's deposition at 157–59).

In the meantime, SA [***]'s workload logs reveal that he was continuing to actively work on the case between the end of [***] and the beginning of [***], when he interviewed an unnamed witness. Pl.'s App. of Add'l Supporting Documentation (Pl.'s Add'l App.) at 182, ECF No. 191-4. In addition, on [***], SA [***] completed a form entitled "Annual Suitability Review of a Confidential Informant." Def.'s Mot. App. at 5. In it, SA [***] wrote that "CI is providing relevant information to an ongoing investigation." Id. His workload logs then reflect further

---

[12] In its deposition, CI described this inquiry as "looking for assurance." Def.'s Mot. App. at 362 (CI's deposition at 162). CI asserted that it was seeking assurances that the IRS was going to investigate the tax evasion scheme and not drop the case. See id. at 362–63 (CI's deposition at 162–66).

hours devoted to reviewing records in the case at the beginning of December. Pl.'s Add'l App. at 182.

In [***], primary responsibility over the investigation was transferred from SA [***] to SA [***]. Def.'s Mot. App. at 127. Soon thereafter, the IRS Criminal Investigation division began [***] operations aimed at the alleged tax evasion scheme. First, in a telephone call, [***] engaged in discussions with the investigation's principal target about [***] allegedly engaged in the tax evasion scheme. Id. at 17. On [***], those agents met in person with the target. Id. at 13; see also id. at 17. According to the IRS's reports of that [***] operation, the target "expressed a knowledge that some of the [***] were [***]" and that "[***] may [***]." Id. at 17; see also id. at 13. The target, however, also made clear to the agents "that he was [***]." Id. at 17; see also id. at 13.

The IRS followed the initial [***] operations with a second round between [***]. Id. at 16–17. The [***] met again with the principal target, as well as with an [***] and [***]. Id. at 17; see also id. at 23. This [***] told the agents that "[***]." Id. at 17; see also id. at 23. Although he and the principal were aware of [***], "[***] had nothing to do with it." Id. at 17; see also id. at 23.

## V.     The IRS Closes Its Criminal Investigation

Following the second round of undercover operations, on [***], SA [***] prepared a memorandum summarizing the criminal investigation and recommending that the investigation be "discontinued." Id. at 20–24. Specifically, he wrote that "[t]he evidence obtained . . . shows that while [the target] may believe, or know, that [***] . . . , it does not appear that [the target] is [***]" and that the target "[***]." Id. at 24. SA [***] concluded that "[w]hile it is possible that [the target] may be involved at some level with a scheme to [***], it would prove a difficult hurdle [***] to show [the target's] knowledge of such a scheme." Id. Therefore, he "recommended that the criminal investigation . . . be discontinued." Id.

In conjunction with this memorandum, SA [***] also drafted a Form 13308, the "Criminal Investigation Closing Report." Tufts Decl. Ex. W, ECF No. 183-7. In section one of the form, SA [***] checked boxes indicating that the form was being sent on behalf of SAC [***] to the Territory Manager of the Technical Services unit for "Notice only." Id. But then in section four, SA [***] checked the box indicating that civil tax activity was warranted, specifically an "Examination Function." Id. Conversely, in section six, which sets aside space to identify any documents attached to the form, SA [***] checked the box indicating that the section was not applicable because the case was "Closing to Files." See id.

On [***], Assistant Special Agent in Charge (ASAC) [***] reviewed SA [***]'s closing memorandum and Form 13308. Tufts Decl. Ex. D, ECF No. 183-1. She made edits to SA [***]'s Form 13308 so that it uniformly reflected that the matter was being forwarded to the civil side for additional examination and assessment. See id. In particular, in section one, she amended the form to select the box indicating that the form was being sent to the Territory Manager of the Technical Services unit "For assessment." Id. And, in section six, she changed SA [***]'s

selection to the box indicating that the "Investigative Source Document" was being attached to the Form 13308. Id.[13]

In her email forwarding the form and closing memorandum to SSA [***], ASAC [***] wrote that "collection be notified we are closing the case." Id. She also wrote that she had changed the selection in section six of Form 13308 because "the Information Item should be attached when this is forwarded to Exam." Id. Finally, in another email later that day, ASAC [***] wrote to both SAs [***] and [***] that she had approved the discontinuance and "updated the status [in the IRS's case tracking system] to indicate 13308 to SBSE."[14] Tufts Decl. Ex. E.

On [***], SAC [***] submitted a memorandum to [***], the Director of the Criminal Investigation division's Special Investigative Techniques unit, entitled "Undercover Operation Closing Report." Def.'s Mot. App. at 16–19. This memorandum summarized the undercover work and appraised the operation. It also noted that the "Criminal Investigation was discontinued on [***] . . . due to an apparent lack of knowledge on the part of" the target. Id. at 17. On the memorandum's last page, in a section entitled "Income Tax Return Information," SAC [***] wrote that "[f]ederal income tax returns [had been] ordered and analyzed prior to the undercover operation." Id. at 19. He continued by stating that "[a]t this time additional returns are being requested to further analyze and corroborate allegations that [***]." Id.

The record does not reflect any further action on CI's disclosures by the IRS. Approximately eight months after the criminal investigation was closed, however, on [***], SA [***] recommended that CI be "deactivated" because "the information provided was almost ten years old" and because "[t]he undercover operation . . . did not obtain evidence that [***] was still occurring nor that it was practiced in the last five years." Id. at 28. He also noted that there had "been no contact from the CI for over a year," and asserted that CI "filed a Form 211 for reward that would only be paid if the case was successful in collecting tax." Id.[15] SA [***] also wrote that "[a] letter stating that the CI was deactivated was mailed certified via U.S. Postal

---

[13] Form 13308 also contains a section nine entitled "Notice to Technical Services and Advisory." See Tufts Decl. Ex. D. This section contains subsections that are to be completed by the Technical Services and/or Advisory units upon receipt of the form, as well as after they take certain other actions. See id. A copy of the form with the appropriate subsections completed by the Technical Services or Advisory unit is to be "[r]eturn[ed] . . . to [the Criminal Investigation division] after each update." Id. Section nine of Form 13308 came about as a result of a Treasury Inspector General for Tax Administration report from September 2004, in which the inspector general noted the need to ensure appropriate and effective communication and coordination between the IRS's civil and criminal sides. See Confidential Informant 59-05071's Mot. for Spoliation of Evid. & for Sanctions Ex. D, ECF No. 162-2.

[14] SBSE stands for the IRS's Small Business/Self-Employed division, which focuses on the examination and collection of taxes due from small businesses and individuals who are self-employed. Small Business/Self-Employed Division At-a-Glance, IRS, https://www.irs.gov/uac/small-business-self-employed-division-at-a-glance (last updated Nov. 4, 2016).

[15] SA [***]'s statement that CI filed a Form 211 is not supported by the rest of the record.

Service to the CI's current address," id., but the government acknowledges that no letter was ever mailed to Plaintiff regarding the same, SA [***]'s statement notwithstanding, Def.'s Proposed Findings of Uncontroverted Facts ¶ 34, ECF No. 177. SAC [***] approved SA [***]'s deactivation memorandum on [***]. Def.'s Mot. App. at 25.

## VI.   Plaintiff's Counsel Seeks an Accounting from the IRS

On [***], approximately four-and-a-half years after CI's last attempt to communicate with the IRS, and two-and-a-half years after SAC [***] approved the deactivation memorandum, counsel, now again representing CI, wrote to the director of the IRS's whistleblower office.[16] Tufts Decl. Ex. Z. He requested an accounting with respect to the Reward Agreement and the IRS's investigation of CI's allegations. Id. At that time, according to CI's counsel, he was advised that the whistleblower office was unaware of the Reward Agreement. See Tufts Decl. Ex. AA ([***] letter from Mr. Tufts to IRS whistleblower office asserting that it was his understanding from a conversation with someone in the whistleblower office that it "d[id] not have any record of the[] agreements" between the IRS and CI).

Approximately three months later, on [***], SA [***] prepared a Form 11369 in connection with the Criminal Investigation division's investigation of CI's information. See Pl.'s Add'l App. at 183 (entry in SA [***]'s work log). Form 11369 is "used to inform the Whistleblower Office of the whistleblower's contributions, if any, to the examination, investigation, or other action." Internal Revenue Manual (IRM) § 25.2.2.6. The IRS requires that a Form 11369 be submitted "for each relevant taxpayer affected by an IRS action." Id. A Form 11369 must also be submitted "prior to transferring a whistleblower claim to another group, area, or operating division." Id.

According to a [***] declaration by the director of the whistleblower office, the office had "reviewed records of an IRS criminal investigation initiated based on Plaintiff's information," but the "investigation did not result in the assessment or collection of additional tax, penalties, interest or other amounts." Def.'s Mot. App. at 401–03. "Further," according to the director, the whistleblower office was "not aware of Plaintiff's information . . . being used, in any capacity, to assess or collect additional money from taxpayers." Id. at 402 (emphasis in original). The director also reported that his office reviewed the audit history of [***] identified by CI and that "[n]one . . . were audited in the time period from [***] to [***]." Id. Similarly, the director noted that his office had reviewed the audit history of [***]. Id. With respect to one, this review revealed an audit in [***] for the [***] tax year, resulting in the assessment of an additional $[***] in taxes, but according to the director, "the audit did not originate as a result of any investigation associated with petitioner's information." Id. The [***] was not audited in the period [***] to [***]. Id.

---

[16] The Court notes that the IRS's whistleblower office was established following a December 20, 2006 act of Congress. Whistleblower Office At-a-Glance, IRS, https://www.irs.gov/about-irs/whistleblower-office-at-a-glance (last updated Aug. 3, 2017); Tax Relief and Health Act of 2006, Pub. L. 109-432, § 406, 120 Stat. 2922 (2006). It thus did not exist when CI entered the Reward Agreement with the IRS.

## VII.   This Action

On March 10, 2011, Plaintiff filed its complaint, alleging that the IRS had breached the Reward Agreement through anticipatory repudiation and by violating the duty of good faith and fair dealing. ECF No. 1. CI also demanded an accounting. Id.

On November 22, 2011, Chief Judge Hewitt (to whom the case was originally assigned) issued an opinion denying the government's motion to dismiss CI's complaint. Drawing all reasonable inferences in favor of CI, the court concluded that CI had pleaded facts sufficient to support CI's claims of anticipatory repudiation and breach of the duty of good faith and fair dealing. Opinion, ECF No. 16. With respect to CI's claim for an accounting, Chief Judge Hewitt found that the "Reward Agreement contemplate[d] the possibility that plaintiff may, in appropriate circumstances, seek an accounting." Id. at 22. Thus, at that "early stage of litigation," the court "decline[d] to address defendant's attempt to remove" the accounting claim. Id.

Extensive discovery and motion practice then followed over the next five years.[17] Plaintiff ultimately filed the operative third amended complaint on September 14, 2015. ECF No. 137-1. In it, Plaintiff again asserts three claims: 1) breach of contract by anticipatory repudiation; 2) breach of the covenant of good faith and fair dealing; and 3) a demand for an accounting. 3d Am. Compl. ¶¶ 37–59. It demands damages in the amount of $35,000,000 for both Count I and Count II. Id. ¶¶ 38, 48.

On September 30, 2016, the government filed its current motion for summary judgment and renewed its motion to dismiss Count III for lack of jurisdiction. ECF No. 176. It argues that it is entitled to summary judgment as to Counts I and II, and that as a result, the Court lacks jurisdiction over Count III. Id. at 10–11.

On November 19, 2016, Plaintiff filed its cross-motion for summary judgment as to Count III. ECF No. 184. Plaintiff has also filed additional motions requesting that the Court take judicial notice of certain documents, requesting modification of the protective order issued in this case, and seeking further discovery pursuant to Rule 56(d) of the Rules of the Court of Federal Claims (RCFC). ECF Nos. 199, 207, 210.

Oral argument was held on August 24, 2017. See Order, ECF No. 209.

## DISCUSSION

## I.   Plaintiff's Motion for the Court to Take Judicial Notice

On March 17, 2017, CI filed a motion asking the Court to take judicial notice of hundreds of pages of news articles, press releases, and court filings. ECF No. 199. These documents contain information about [***]. Based upon these documents, CI asks the court to take judicial notice of the following facts: 1) "that the Government (IRS and [***]) has taken actions against

---

[17] Three prior opinions in this case have dealt with discovery disputes. See Confidential Informant 59-05071, 2016 WL 3960442, at *1; Confidential Informant 59-05071, 121 Fed. Cl. at 38; Confidential Informant 59-05071, 108 Fed. Cl. at 126–27.

the [***] since [***]"; and 2) that "[t]hroughout the time when Plaintiff has served as a confidential informant [***]." Pl.'s Reply to Def.'s Resp. to Pl.'s Request for Court to Take Judicial Notice at 1, ECF No. 206 (emphasis omitted).

The Court of Federal Claims may take judicial notice consistent with the provisions of Federal Rule of Evidence (FRE) 201. See Wash. Mut., Inc. v. United States, 130 Fed. Cl. 653, 704 (2017); Canpro Invs. Ltd. v. United States, 130 Fed. Cl. 320, 331 n.2 (2017); see also Rodriguez v. Sec'y of HHS, 91 Fed. Cl. 453, 460 (2010), aff'd, 632 F.3d 1381 (Fed. Cir. 2011). Pursuant to FRE 201, the Court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Whether to take judicial notice is a matter of discretion for the Court. See K/S Himpp v. Hear-Wear Techs., LLC, 751 F.3d 1362, 1367 (Fed. Cir. 2014); Murakami v. United States, 398 F.3d 1342, 1355 (Fed. Cir. 2005).

Here, CI has failed to persuade the Court that it would be appropriate to take judicial notice of the existence of other IRS and/or [***] enforcement actions against [***] or of the activity of the [***]. First, the Court declines to take judicial notice of these alleged facts because the existence of other enforcement actions and the [***] do not appear to be of particular relevance to CI's claims. See Kvichak Marine Indus., Inc. v. United States, 118 Fed. Cl. 385, 387–88 (2014) (noting that plaintiff failed to establish that "articles it submitted [we]re properly the subject of judicial notice, []or that they [we]re necessary for the court's review of th[e] case"). So far as the Court has been able to discern, none of the [***] mentioned in the documents attached to CI's motion were identified by CI in the information it provided to the IRS. Second, the Court declines to take judicial notice of facts on the basis of printouts of news articles from online sources because the Court cannot readily determine their accuracy or credibility. See id. (declining to take judicial notice of printouts from various websites). Accordingly, CI's motion for the Court to take judicial notice (ECF No. 199) is **DENIED**.

## II.    Standards for Granting Summary Judgment

The standards for granting summary judgment are well established. Summary judgment may be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. RCFC 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575 (Fed. Cir. 1994); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). All significant doubts regarding factual issues must be resolved in favor of the party opposing summary judgment. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). "[T]he party opposing summary judgment must show an evidentiary conflict on the record; mere denials or conclusory statements are not sufficient." Id. at 1390–91. "[E]ntry of summary judgment is appropriate against a [party] 'who fails to make a showing sufficient to establish the existence of an essential element to [its] case, and on which [it] will bear the burden of proof at trial.'" Zafer Taahhut Insaat ve Ticaret A.S. v.

United States, 833 F.3d 1356, 1362–63 (Fed. Cir. 2016) (quoting Celotex Corp., 477 U.S. at 322) (third and fourth alterations in original).

## III.   CI's Claim of Anticipatory Repudiation

In Count I, CI claims that the IRS anticipatorily repudiated the Reward Agreement when SA [***] allegedly stated to CI that unless CI agreed to modify the Reward Agreement or signed a Form 211, the IRS would not pursue an investigation based upon the information CI provided. See 3d Am. Compl. ¶ 40; Pl.'s Mot. at 12–13; see also Confidential Informant 59-05071, 121 Fed. Cl. at 43–44. For the reasons set forth below, the Court concludes that the IRS did not engage in an anticipatory repudiation of the Reward Agreement and the government is entitled to summary judgment as to this count.

"An anticipatory repudiation is a renunciation of a contractual duty before the time fixed in the contract . . . for performance." Ind. Mich. Power Co. v. United States, 422 F.3d 1369, 1374 (Fed. Cir. 2005) (emphasis and omission in original) (quotation omitted). "Repudiation is defined as a 'statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach.'" Amber Res. Co. v. United States, 538 F.3d 1358, 1368 (Fed. Cir. 2008) (quoting Restatement (Second) of Contracts ("Restatement") § 250 (Am. Law Inst. 1981)).

A party may establish an anticipatory repudiation in one of two ways: 1) by showing that the other party clearly and expressly communicated an intention not to perform a contractual duty; or 2) by showing that it reasonably believed the other party would breach a contractual duty by non-performance, and that the other party failed to provide adequate assurances that it intended to comply with its obligations. See Danzig v. AEC Corp., 224 F.3d 1333, 1337–38 (Fed. Cir. 2000); see also Fredericksburg Non-Profit Hous. Corp. v. United States, 113 Fed. Cl. 244, 254–55 (2013) (finding that the government did not repudiate its contractual obligations because the court found no "refusal to perform any of [its] alleged contractual duties"). A party's expressed intent not to perform a contractual obligation unless the other party agrees to renegotiate the terms of the contract may constitute an anticipatory repudiation. See Restatement § 250 cmt. d (stating that "where a party wrongfully states that he will not perform at all unless the other party consents to a modification of his contract rights, the statement is a repudiation").

As an initial matter, Plaintiff's anticipatory repudiation claim fails as a matter of law because Plaintiff did not treat the alleged repudiation as a breach prior to the time for performance. Thus, a repudiation "ripens into a breach prior to the time for performance only if the promisee 'elects to treat it as such.'" Franconia Assocs. v. United States, 536 U.S. 129, 143 (2002) (quoting Roehm v. Horst, 178 U.S. 1, 13 (1900)) (emphasis added). That is, if a promisor repudiates a contractual obligation prior to the time for performance, that repudiation "give[s] the promisee the right of electing either to . . . wait till the time for [the promisor's] performance has arrived, or to act upon [the renunciation] and treat it as a final assertion by the promisor that he is no longer bound by the contract." Id. (quoting Roehm, 178 U.S. at 13) (alterations and omission in original). Absent a suit by the promisee prior to the time for performance treating the repudiation as a "present breach," the repudiation is not an "immediate breach," and a breach only occurs if the promisor fails to render its performance at the time due. See id.

Here, even assuming that the government had a contractual duty to conduct an investigation based on the information that CI provided, and that it expressed an intent not to perform that obligation through threats allegedly made by SA [***], Plaintiff did not elect to treat the IRS's alleged repudiation as a breach by filing suit when the alleged repudiation occurred, in approximately [***] and [***]. Plaintiff did not file its lawsuit until March 2011. In the interim, notwithstanding any prior threats allegedly made by SA [***] or other IRS officials, the government performed a criminal investigation of Plaintiff's allegations. That is, it performed the duty Plaintiff asserts it repudiated. In other words, even if the IRS had previously repudiated a contractual obligation to conduct an investigation of Plaintiff's disclosures, it effectively revoked that repudiation by performance. Because Plaintiff did not choose to treat the alleged repudiation as a breach by filing suit at the time the IRS allegedly made its threats, and because the IRS subsequently performed, the IRS did not anticipatorily repudiate the Reward Agreement. See id.; see also Amber Res. Co., 538 F.3d at 1369–70, 1376–77 (holding that the alleged repudiation was not an anticipatory repudiation in part because the parties continued to perform after its occurrence, and discussing doctrine of election); Tretchick v. Dep't of Transp., 109 F.3d 749, 752 (Fed. Cir. 1997) (stating that an anticipatory repudiation "must be a distinct unequivocal absolute refusal to perform . . . treated and acted upon as such by the party to whom the promise was made" (quoting Dingley v. Oler, 117 U.S. 490, 503 (1886))); Restatement § 256 (noting that promisor's conduct prior to promisee's reliance upon repudiation can nullify or retract repudiation).[18]

In any event, even if an anticipatory repudiation claim was properly before the Court, CI has not produced any evidence that the IRS threatened not to perform any obligation imposed by the contract. As Chief Judge Hewitt previously found, ECF No. 16 at 14, and as CI admits, see Pl.'s Mot. at 3–4, under the Reward Agreement the IRS was not obligated to open an investigation or take any enforcement action on the basis of the information CI provided. Its obligations, as Chief Judge Hewitt observed, were to take specified actions to protect CI's identity from disclosure and to pay CI a specific monetary amount based upon any "net tax liabilities . . . collected as a result of information or documentation supplied by [CI]." ECF No. 16 at 13–14 (quoting the Reward Agreement).

Although CI's pleadings and briefs do not clearly identify the obligation it alleges the IRS repudiated, CI's claim (as noted above) appears to be based on SA [***]'s alleged threats that the IRS would not "pursue the case"—i.e., not conduct an investigation—unless Plaintiff agreed to renegotiate the Reward Agreement. See Pl.'s Mot. at 6 (arguing that "Special Agent [***] tried to persuade [CI] to sign a Form 211 and enter into an amendment to the Reward Agreement because only then could the IRS proceed" with the investigation); see id. at 17 (contending that CI engaged in an act of repudiation when it threatened that it would not "pursue the case"); CI's Decl. at 10 (stating that SA [***] "kept on threatening me by saying over and over, unless I signed [a] new agreement, the IRS would drop the case" (emphasis omitted)); see also Def.'s Mot. App. at 353 (CI testifying in deposition that IRS special agent

_____

[18] The Court notes that at the time Plaintiff first filed this action, it was unaware that the IRS had, in fact, already performed a criminal investigation based on the information it provided. This may explain why Plaintiff included an anticipatory repudiation claim in its complaint (although it does not explain Plaintiff's continued pursuit of that claim following discovery).

threatened not to pursue the case); <u>Confidential Informant 59-05071</u>, 121 Fed. Cl. at 43–44 (noting that "it now seems clear that plaintiff's allegation is that the IRS threatened that it would not conduct or complete any investigation based on the information that plaintiff provided").

As a matter of law, SA [***]'s statement that the IRS would not "pursue the case" unless CI agreed to renegotiate the Reward Agreement cannot constitute an anticipatory repudiation because the statement does not convey an intent not to perform a contractual duty. This is because the IRS was not contractually obligated to pursue an investigation or enforcement action based on the information CI provided. Further, to the extent that CI is now alleging that the IRS threatened to either not protect CI's identity or not pay it any reward if the IRS recovered taxes, such an allegation lacks any support in the record.

To the contrary, CI affirmatively stated during its deposition that IRS personnel did not threaten to withhold a reward due under the agreement and did not threaten to reveal CI's identity. Def.'s Mot. App. at 353–55. CI testified as follows:

> Q.     And what exact threat did Mr. [***] tell you?
> A.     He say, if I did not sign form 211 he couldn't pursue the case.
> Q.     Did he say he wouldn't pay you?
> A.     No. He just say we – we will not pursue the case.
> Q.     Okay.
> A.     I have no idea of money.
> Q.     He never mentioned money when he was –
> A.     He never did.
> Q.     Okay. Anybody else from the IRS ever mention money?
> A.     I don't believe so.
>
> * * *
>
> Q.     He certainly didn't say, if you don't sign this agreement I'm going to divulge your identity.
> A.     No. He didn't say that.
> Q.     Or anything like that.
> A.     No.
> Q.     Anybody else in the IRS say anything like that?
> A.     No, not that I remember.

<u>Id.</u>

Notwithstanding CI's deposition testimony that no one at the IRS mentioned money in threatening not to pursue the case, in a declaration submitted in opposition to the government's motion, CI asserts that SA [***] threatened that the IRS "could not proceed and [CI] wouldn't ever see any money unless" CI renegotiated the award agreement. CI's Decl. at 7. But assuming SA [***] made a statement to this effect, it would not convey a clear and express intent on the IRS's part not to perform a contractual duty. To the contrary, the statement instead appears to again reflect—at most—a threat not to conduct an investigation that might ultimately lead to the

recovery of money. In other words, CI would "never see any money" because the IRS would not pursue an investigation or enforcement action based on CI's information.[19]

In any event, to the extent that CI's declaration contradicts CI's earlier deposition testimony that neither SA [***] nor anyone else at the IRS ever mentioned the issue of money, the Court must disregard it. Sinskey v. Pharmacia Ophthalmics, Inc., 982 F.2d 494, 498 (Fed. Cir. 1992) ("A party cannot create an issue of fact by supplying an affidavit contradicting his prior deposition testimony, without explaining the contradiction or attempting to resolve the disparity."), abrogated in part on other grounds by Pfaff v. Wells Elecs., Inc., 525 U.S. 55 (1998), as recognized by Invitrogen Corp. v. Biocrest Mfg., LP, 424 F.3d 1374, 1379–80 (Fed. Cir. 2005); see also Burns v. Bd. of Cty. Comm'rs of Jackson Cty., 330 F.3d 1275, 1281–82 (10th Cir. 2003) (court will disregard "contrary affidavit . . . when it constitutes an attempt to create a sham fact issue" (quotation omitted)); Grand Acadian, Inc. v. United States, 87 Fed. Cl. 193, 206–07 (2009).[20]

Nor is there anything in the record to support an argument that—notwithstanding the absence of explicit threats—CI reasonably believed that the IRS was threatening to not protect its identity or to not pay CI reward money even if it collected taxes based on the information CI provided. As noted, CI's stated concern throughout the events that triggered this litigation was that the IRS would not conduct any investigation at all that could trigger CI's entitlement to reward money. CI never expressed any concern that, if the IRS did investigate and recover money, it would not pay CI the reward money to which it was entitled under the agreement. Further, CI did not seek assurances regarding the protection of its identity or the payment of reward money; CI sought assurances that the IRS would act on the information CI provided. Pl.'s Mot. at 7 (contending that "[i]n an email sent in [***] and a certified letter sent in [***], [CI] continued [to] request[] assurances from Special Agent [***] that the IRS was not going to drop the case"); id. at 18 (stating that CI was "seeking . . . assurances that the matter was not going to be dropped"). Indeed, in the email and letters CI sent to SA [***] in [***] and [***], CI asked whether there had been "any progress" made on the case and made no mention of the protection

---

[19] In fact, in its declaration, CI states that "I always believe[d] that the threats [***] was making that IRS would not pursue the case, or that the IRS would drop the case, unless I signed IRS Form 211 or unless I agreed to some new amendment, mean[t] that the IRS was refusing to perform under the Reward Agreement and therefore, I would not ever get money or any reward." CI's Decl. at 9.

[20] The Court rejects CI's effort to disavow its deposition testimony on the ground that English is not CI's native language. CI's Decl. at 9. CI was represented by counsel at the deposition. Further, the government's attorney expressly cautioned CI that if it did not understand a question because of difficulty with English, CI should let counsel know, and CI acknowledged the same. Def.'s Mot. App. at 323–24; see also id. at 341. CI did not raise a language concern when asked about SA [***]'s threats, but answered clearly, as noted above.

of CI's identity or the recovery of reward money.[21] See Def.'s Mot. App. at 360–61; CI's Decl. Ex. 21.

In short, the government is entitled to summary judgment as to Plaintiff's anticipatory repudiation claim because Plaintiff did not elect to treat the IRS's alleged repudiation as a breach by filing suit when the alleged repudiations occurred, and because by the time suit was filed, some five years later, the IRS had performed the obligations Plaintiff alleges it repudiated. Further, and in any event, the record does not contain any evidence that the IRS made an express or reasonably perceived threat not to comply with its obligations under the existing Reward Agreement as to the protection of CI's identity or with respect to giving CI a monetary reward if CI's disclosures resulted in the collection of back taxes. For these reasons, and because CI bears the burden of proving these elements to establish its anticipatory repudiation claim, the government is entitled to the entry of summary judgment as to Count I of CI's third amended complaint. See Dairyland Power Coop. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994) ("A nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law.").

## IV. Plaintiff's Breach of Contract Claim Based Upon the Covenant of Good Faith and Fair Dealing

As the court of appeals has observed, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." Metcalf Constr. Co. v. United States, 742 F.3d 984, 990 (Fed. Cir. 2014) (quoting Restatement § 205). "Failure to fulfill that duty constitutes a breach of contract, as does failure to fulfill a duty 'imposed by a promise stated in the agreement.'" Id. (quoting Restatement § 235). These principles apply to contracts with the federal government. Id. (citing Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 828 (Fed. Cir. 2010) and Malone v. United States, 849 F.2d 1441, 1445–46 (Fed. Cir. 1988)).

"The covenant of good faith and fair dealing . . . imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." Id. at 991 (quoting Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005)) (emphases and omission in original). "Not all misbehavior, however, breaches the implied duty of good faith and fair dealing . . . ." Precision Pine & Timber, Inc., 596 F.3d at 829. "What is promised or disclaimed in a contract helps define what constitutes 'lack of diligence and interference with or failure to cooperate in the other party's performance.'" Metcalf, 742 F.3d at 991 (quoting Malone, 849 F.2d at 1445). Thus, the "implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties

---

[21] The Court notes that in the [***] letter to SA [***], CI stated its belief that it had a "right to receive reports on the case according to the Agreement." CI's Decl. Ex. 21. SA [***] testified that he would not have responded to this letter because CI "doesn't have any right to anything." Def.'s Mot. App. at 282. SA [***]'s testimony on this point—while bluntly expressed—is accurate insofar as there was nothing in the Reward Agreement that obligated the IRS to provide CI with updates or otherwise be responsive to its calls or emails.

inconsistent with the contract's provisions." Id. (quoting Precision Pine & Timber, Inc., 596 F.3d at 831). This "means simply that an act will not be found to violate the duty (which is implicit in the contract) if such a finding would be at odds with the terms of the original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision." Id.

In Count II of its third amended complaint, CI alleges that the IRS violated the covenant of good faith and fair dealing through a series of actions it took, beginning in [***]. These alleged actions included: 1) "[i]gnoring and refusing to communicate with and return emails from [CI] on the status of the case"; 2) "not informing [CI] that efforts were being made by [the government] in [***] to deactivate [CI]"; 3) "refusing to proceed with any civil actions . . . after receiving reliable corroboration of [CI's] information"; 4) "[f]ailing to . . . pursue any action in the investigation of one of the [***] identified taxpayers involved in [the] [***] Tax Evasion Scheme, in conjunction with [CI]"; 5) "[t]hreatening non-performance and breach, and then abandoning [CI] . . . unless [CI] agreed to . . . execute a proposed Second Amendment"; 6) "ignoring [CI's] advice and instruction . . . specific to the on-going [***] Tax Evasion Scheme"; 7) "ignoring [CI's] advice and instruction . . . by conducting an undercover investigation without [CI]"; 8) "making misleading statements regarding the ability and competency of [CI's] attorney to extract a modification of the Reward Agreement"; and 9) "[p]reventing and disrupting [CI's] ability to assist and perform in the development of the case." 3rd Am. Compl. ¶ 54.

The Court concludes that the government is entitled to summary judgment as to Count II of the complaint. First, the Court agrees with the government that the IRS was not obligated by the duty of good faith and fair dealing to pursue any investigation or enforcement action based on the information CI supplied. The agreement itself did not obligate the government to take any particular action in response to CI's disclosures. And it is well established that the decision of a government agency whether to conduct an investigation or bring an enforcement action "is normally committed to the discretion of the investigative agency." Lewis v. United States, 70 F.3d 597, 601 (Fed. Cir. 1995). As the Supreme Court observed in Heckler v. Chaney, 470 U.S. 821, 831 (1985), "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise." "Thus," the Court continued, "the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." Id. Given these principles, the Court agrees with Judge Bruggink that "implying a[] [contractual] obligation to make enforcement decisions in view of an informant's expectations would impermissibly involve the court in the internal affairs and judgments of an executive agency." Jarvis v. United States, 43 Fed. Cl. 529, 534 (1999); see also Conway v. United States, 56 Fed. Cl. 572, 579 (2003).

The same is true as to implied contractual obligations that would govern how (or even if) the IRS communicated with one of its informants. In the Court's view, decisions about communications or interactions with an informant may also involve law enforcement judgments by the agency in which a court should not become entangled. Further, the Reward Agreement expressly stated that CI's role would be limited to providing information in written form about

individuals believed to be engaged in tax evasion. 3rd Am. Compl. Ex. 1 at 2. It did not impose any obligations on the IRS with respect to its contacts with CI and it did not require the agency to consider CI's "advice and instruction" regarding any aspect of its investigative activities. The Court concludes that it would "expand [the IRS's] contractual duties beyond those in the express contract" and "create duties inconsistent with the contract's provisions" if the Court were to imply that the IRS was obligated to give CI any advisory or consultative role in its enforcement decisions. See Metcalf, 742 F.3d at 991.

Further, contrary to Plaintiff's argument, the IRS's failure to communicate with CI did not interfere with CI's ability to perform its obligations under the contract. In fact, the alleged failures to communicate with CI occurred after CI had already performed on the contract by supplying the IRS with information about the alleged tax evasion scheme.[22]

The fact that the IRS was not implicitly obligated to conduct any investigation, take any enforcement action, or keep CI apprised of its actions, however, is not necessarily the end of the matter. Although the Court has been hard-pressed throughout this litigation to discern any unifying theme in CI's allegations of mistreatment by the IRS, see Confidential Informant 59-05071, 121 Fed. Cl. at 43–45, it appears that the gravamen of CI's complaint is that the IRS deliberately scrapped or truncated any criminal investigation and/or civil enforcement action with the specific intent of preventing CI from reaping the benefits of the Reward Agreement after CI had already performed its end of the bargain. See 3rd Am. Compl. ¶ 54(C); Oral Argument at 2:39pm; id. at 2:40:52pm; id. at 2:45:50pm; see also Precision Pine & Timber, Inc., 596 F.3d at 829 (holding that "[t]he government may be liable for damages when the subsequent government action is specifically designed to reappropriate the benefits the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract"); Centex Corp., 395 F.3d at 1304 (holding that the covenant of good faith and fair dealing obligates the government not to "destroy" a party's "reasonable expectations . . . regarding the fruits of the contract").[23]

But while this theory states a claim for relief, in order to prove its claim, CI must present sufficient evidence to rebut the presumption that government officials discharge their duties in good faith. See Rd. & Highway Builders, LLC v. United States, 702 F.3d 1365, 1368–69 (Fed.

---

[22] This case is therefore distinguishable from D'Andrea Brothers LLC v. United States, relied upon by CI, in which the court found an implied duty to communicate and found that the government breached it. 109 Fed. Cl. 243, 256 (2013). There, unlike here, the parties agreed "to engage in cooperative research" and the government agreed to help the plaintiff "test and improve" the energy bar at issue in that case. Id. at 247. The court described the agreement as a "unique contract based on cooperation." Id. at 259. Thus, communication was necessarily implied and required for performance. See id. at 259–60.

[23] The government did not address the validity of this legal theory in its briefs, but it acknowledged at oral argument that, as a matter of law, the duty of good faith and fair dealing would impose an obligation on the IRS not to drop its investigation or examination in retaliation for Plaintiff's refusal to modify the agreement. See Oral Argument at 2:14:15pm–2:15:40pm; id. at 2:30:10pm–2:30:38pm.

Cir. 2012). In fact, when a party "alleges bad faith, in order to overcome the presumption of good faith on behalf of the government, the proof must be almost irrefragable." Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (quoting Info. Tech. Applications Corp. v. United States, 316 F.3d 1312, 1323 n.2 (Fed. Cir. 2003)) (alterations omitted). In other words, the proof of bad faith must be supported by "clear and convincing evidence." Am–Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239–40 (Fed. Cir. 2002). "[T]he necessary 'irrefragable proof' has [also] been equated with evidence of some specific intent to injure the plaintiff." Galen Med. Assocs., Inc., 369 F.3d at 1330 (quoting Torncello v. United States, 231 Ct. Cl. 20, 45 (1982)); see also Rd. & Highway Builders, LLC, 702 F.3d at 1369 ("[A] challenger seeking to prove that a government official acted in bad faith in the discharge of his or her duties must show a specific intent to injure the plaintiff by clear and convincing evidence." (quotation omitted)).

In this case, CI has not submitted any evidence to rebut the presumption that the government acted in good faith when it did not pursue either a criminal or civil enforcement action based on CI's disclosures. In fact, CI's bad faith claim seems wholly implausible based on the undisputed facts of the case.

Thus, CI's claim that the IRS harbored a specific intent to deny it the benefits of the contract is based primarily on inferences CI would have the Court draw from events that occurred between [***] and [***]. It is during that period that, as a result of concerns raised by UPM [***], SA [***] allegedly threatened that the IRS would not pursue CI's disclosures unless CI agreed to modify the Reward Agreement.

Specifically, the record shows that UPM [***]'s involvement in this matter pertained to the transfer of the case from LMSB to criminal investigators in the [***] Field Office, and the impact of the Reward Agreement on any criminal investigation. See Def.'s Mot. App. at 68–69 ([***] Deposition at 150–59); id. at 1–4. In UPM [***]'s opinion, the Reward Agreement signed by LMSB was contrary to IRS policy both in terms of the amount of any potential reward and the provisions protecting against disclosure of CI's identity, which UPM [***] believed might interfere with the IRS's ultimate ability to pursue a criminal investigation and prosecution based on the information CI had provided. See id. at 69 ([***] Deposition at 156). He suggested "start[ing] over" on the agreement between CI and the IRS and recommended not doing "anything proactive with the CI until the new agreement [wa]s in force." Id. at 3. He was further of the view that given the size of the potential reward, the new agreement should be submitted to higher level officials in the criminal division for approval. See id. at 1–4.

The record also contains evidence that, based on UPM [***]'s recommendation, SA [***] was tasked with trying to convince CI to agree to modify the Reward Agreement. Among other things, there is evidence in the record that SA [***] attempted to pressure CI into signing a Form 211 to replace the Reward Agreement by stating that the IRS would not pursue CI's disclosures unless CI did so. In addition, the record shows that after CI rebuffed SA [***]'s efforts, SA [***] stopped responding to CI's emails and did not otherwise communicate with CI, nor did he advise CI when CI was deactivated as an informant.

But notwithstanding the foregoing, it is undisputed that SA [***] abandoned his efforts to convince CI to renegotiate the agreement at some point after [***]. In fact, as CI emphasizes, SA

[***] stopped communicating with CI entirely. More to the point, despite the fact that CI had refused to renegotiate the Reward Agreement, it is undisputed that the criminal investigators in the [***] Office did not drop or scrap the case. To the contrary, they continued to work on the matter over the next two years, and even conducted an undercover operation, albeit without CI's knowledge or participation.

To be sure, the [***] Office eventually closed the criminal investigation it had initiated on the basis of CI's disclosures and the IRS took no enforcement action. But CI does not present any evidence (as opposed to speculation) that the decision to close the criminal investigation was based on animus toward CI rather than the bona fide law enforcement considerations reflected in SA [***]'s memorandum, i.e., insufficient evidence of criminal activity by the principal target and the expense and difficulty of additional investigative activity.

There is similarly no evidence in the record which suggests that CI's refusal to renegotiate the agreement in [***] played any part at all in any subsequent action or failure to act on the part of the IRS's civil side after the criminal case was closed in [***]. To begin with, there is no evidence that the civil side of the IRS shared UPM [***]'s concerns about the propriety of the potential reward or the identity protection provisions of the agreement. In fact, the Reward Agreement itself was negotiated by the civil side of the IRS and the reward formula was approved by the Deputy Commissioner of Internal Revenue. Further, it appears from the record that SA [***] and his supervisor, ASAC [***], completed the paperwork to refer the matter to the IRS's civil side for further consideration after the criminal investigation was closed.

Plaintiff emphasizes that the record does not reveal what, if anything, was done with CI's information after the criminal division closed its case. It also points out that there is no evidence of compliance with the IRS's procedures requiring its civil functions to supply updates to the criminal division after a referral. Further, the record shows that SA [***] did not timely file a Form 11369, which is "a tool used to inform the Whistleblower Office of [a] whistleblower's contributions, if any, to [an] examination, investigation, or other action." IRM § 25.2.2.6.[24] And finally, SA [***] apparently failed to notify CI that it was being deactivated as an informant, again contrary to IRS policy.

But these irregularities and deviations from IRS policy do not, either individually or collectively, raise a genuine issue of fact as to whether the IRS deliberately truncated its criminal investigation or failed to take any civil action based on animus toward CI. In fact, based on the 2004 inspector general report, to which CI has frequently referred throughout this case, it appears

---

[24]A completed Form 11369 is "required for each relevant taxpayer affected by an IRS action" and "must also be submitted to the Whistleblower Office prior to transferring a whistleblower claim to another group, area, or operating division . . . ." IRM § 25.2.2.6. Here, the record reveals (in the form of workload logs) that SA [***] prepared a Form 11369 on March 14, 2011, apparently in the wake of Plaintiff's counsel contacting the whistleblower office. See Pl.'s App. of Add'l Supporting Documentation at 183, ECF No. 191-4. While the Form should have been filled out when the criminal investigation was closed and the matter was transferred to the civil division, in this case that occurred only months after Congress had passed the law establishing the whistleblower office.

that there were systemic deficiencies in the IRS's practices with respect to ensuring that information developed during a criminal investigation was appropriately referred for civil action. See Confidential Informant 59-05071's Mot. for Spoliation of Evid. & for Sanctions Ex. D.

The bottom line here is that nothing in the record reveals or even suggests the reasons why no civil action was taken after the criminal investigation based on CI's disclosures was terminated. Plaintiff's argument thus boils down to a request that the Court apply some variation of the principle of res ipsa loquitur and infer that the civil side's failure to take further action was based on an intent to deprive CI of the fruits of the contract. But a principle akin to res ipsa loquitur can have no application here where there are myriad reasons other than bad faith why the IRS might not have taken any further action based on CI's information, including the age of that information. Further, application of a principle like res ipsa loquitur flies in the face of the requirement that a party submit clear and convincing evidence to rebut the presumption that government officials discharge their duties in good faith.

In short, despite extensive discovery, including depositions of key witnesses such as UPM [***], SA [***], and SA [***], Plaintiff has not managed to produce any evidence— whether direct or circumstantial—that the IRS failed to take criminal or civil investigative or enforcement actions because CI refused to renegotiate the Reward Agreement. At most, the record suggests that during the second half of [***] and into the beginning of [***], the IRS refrained from initiating an investigation and/or paused any investigative efforts while SA [***] attempted to secure Plaintiff's agreement to an amendment to the Reward Agreement. But it is undisputed that SA [***] stopped pressuring CI to renegotiate the agreement around [***], and that the IRS then did conduct a criminal investigation. Although the Court understands that SA [***]'s failure to respond to CI's emails and to notify CI of its deactivation were distressing to CI, the Reward Agreement did not contain provisions requiring the IRS to keep CI advised of the status of the matter. Further, there is no evidence in the record of a bad faith motive with respect to the IRS's failure to take any further action on Plaintiff's disclosures at the time of the closing of the criminal investigation or afterwards. Therefore, the government's motion for summary judgment with respect to Count II is **GRANTED**.

## V.    Plaintiff's Claim for an Accounting

Plaintiff's final count, Count III, is for an accounting. CI moves for summary judgment with respect to this count while the government moves to dismiss it.

Plaintiff's assertion that it has the right to an accounting under the contract lacks merit. The Reward Agreement merely states that "this Agreement shall not prohibit Informant from seeking an accounting from the IRS with respect to this Agreement, consistent with the terms set forth in Paragraph 7 above." 3d Am. Compl. Ex. A at 8. Paragraph 7, in turn, details the method of calculating the tax liability upon which any reward would be based. Id. at 5. Thus, the agreement does not provide CI with a contractual right to an accounting, but rather ensures that nothing in the contract shall preclude Plaintiff from seeking one.

Further, this Court lacks jurisdiction to order an accounting, even if CI was entitled to one under the contract. The Court has power to require an accounting in connection with its jurisdiction over a money claim under the Tucker Act. See Doe v. United States, 100 F.3d 1576,

1578–79, 1584 (Fed. Cir. 1996); see also Rosebud Sioux Tribe v. United States, 102 Fed. Cl. 429, 437 (2011) (noting that Court of Federal Claims has power to order an accounting in aid of its judgment). It does not have such authority, however, where the plaintiff is not entitled to money damages. The Tohono O'odham Nation v. United States, 79 Fed. Cl. 645, 653 (2007) (stating that "the court cannot simply order an accounting as stand-alone relief" but that "'the court has the power to require an accounting in aid of its jurisdiction to render a money judgment on that claim'" (quoting Klamath & Modoc Tribes v. United States, 174 Ct. Cl. 483, 490–91 (1966))), rev'd on other grounds, 559 F.3d 1284 (Fed. Cir. 2009). As a result, absent liability on the part of the defendant on a claim over which the Court has subject matter jurisdiction, the Court lacks jurisdiction over any independent equitable action for an accounting. Cherokee Nation of Okla. v. United States, 21 Cl. Ct. 565, 582 (1990) (citing Glidden Co. v. Zdanok, 370 U.S. 530, 557 (1962) and Klamath & Modoc Tribes, 174 Ct. Cl. at 487–88).

Here, because the government has established that it is entitled to judgment as a matter of law with respect to Counts I and II, there is no claim for money damages as to which the Court could order an accounting. Further, despite its demand for an accounting, none of CI's complaints have included an allegation that the IRS collected taxes based on CI's disclosures but failed to compensate CI pursuant to the Reward Agreement. Instead, Plaintiff's focus in its complaints and in discovery has been on the IRS's alleged threat to scrap the agreement because of its refusal to renegotiate the same.

Finally, according to the IRS's whistleblower office, no money was ever collected on the basis of CI's disclosures. While counsel for CI has at various times expressed skepticism about that representation, Plaintiff never deposed the director of the office or offered any competent evidence to the contrary.[25]

Accordingly, because the Court lacks jurisdiction over independent equitable causes of action for an accounting, the Court must dismiss Count III. RCFC 12(h)(3). The government's motion to dismiss Count III of CI's third amended complaint is therefore **GRANTED** and CI's motion for summary judgment as to Count III is **DENIED**.

## VI.     Plaintiff's Miscellaneous Motions

In addition to the cross-motions for summary judgment and Plaintiff's March 17, 2017 motion to take judicial notice, addressed above, there remain several outstanding motions before

---

[25] In Plaintiff's cross-motion, Plaintiff proffered certificates of release of federal tax liens, which Plaintiff alleged (without proof) represented back taxes collected from an individual Plaintiff had named as a participant in the tax evasion scheme. See Order, ECF No. 211. The government, however, provided a declaration from an IRS senior tax analyst in which the analyst stated that the federal tax liens related to penalties and interest for filing previous tax returns late, and not to any enforcement or compliance action taken based upon Plaintiff's information. See Def.'s Resp. to Aug. 10, 2017 Court Order at 1–2, ECF No. 213. Plaintiff has also at various times suggested that—in light of other enforcement actions taken in [***]—the IRS must have used CI's information in aid of those actions. For the reasons set forth above, the Court has declined to take judicial notice of the news sources and other documents upon which Plaintiff relies, which do not even appear to pertain to any of the [***] about which Plaintiff provided information.

the Court that were filed by Plaintiff. First, on July 13, 2017, Plaintiff filed a motion for relief from the protective order "to allow Plaintiff to [***]." Pl.'s Mot. for Leave to Seek Relief from Protective Order at 2, ECF No. 207. The government does not oppose Plaintiff's motion. Accordingly, Plaintiff's motion for relief from the protective order for purposes of [***] is **GRANTED**.

Second, as noted above, on August 10, 2017, nearly five months after the parties had completed briefing their cross-motions for summary judgment, and only two weeks prior to oral argument on the outstanding motions, Plaintiff filed a pleading styled a "Request for Judicial Notice of July 13, 2017 TIGTA Report and for Relief under RCFC 56(d) and/or RCFC 16(b)(4)." ECF No. 210 (Pl.'s 56(d) Mot.). In that pleading, Plaintiff asks the Court to take judicial notice of a July 13, 2017 report issued by the Treasury Inspector General for Tax Administration (TIGTA), which it alleges calls into question the adequacy of the IRS's responses to Plaintiff's discovery requests in this case.

The government does not object to the Court's taking judicial notice of the TIGTA report in its entirety, as the report "is available to the public through the Treasury Department's internet website." Def.'s Resp. to Pl.'s Req. for Judicial Notice at 1, ECF No. 222. Accordingly, that portion of Plaintiff's motion is **GRANTED**. See Murakami v. United States, 46 Fed. Cl. 731, 739 (2000) (noting court may take judicial notice of government documents including formal government report), aff'd, 398 F.3d at 1354–55.

Finally, Plaintiff requests that the Court issue an order pursuant to RCFC 56(d) directing the government to: 1) "produce all work load logs of those IRS employees involved in the criminal investigation of one of the Taxpayers identified by Plaintiff . . . as was done with the IRS' production of the work load logs of Special Agent [***]"; 2) search for "laptops, desktops, and other computing devices containing ESI for key employees, UPM [***] and tech agent, [***], as revealed by the 2017 TIGTA Report"; and 3) use an "inventory system" to "determine if searchable hard drives exist for any of the IRS employees identified in these proceedings by Plaintiff." Pl.'s 56(d) Mot. at 5. For the reasons set forth below, Plaintiff's motion seeking additional discovery under RCFC 56(d) and/or RCFC 16(d)(4) is **DENIED**.

RCFC 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." To obtain relief, the non-movant must: 1) specify the particular factual discovery being sought; 2) explain how the results of discovery are reasonably expected to engender a genuine issue of material fact; 3) provide an adequate factual predicate for the belief that there are discoverable facts sufficient to raise a genuine and material issue; 4) recite the efforts previously made to obtain those facts; and 5) show good grounds for the failure to have discovered the essential facts sooner. Jade Trading, LLC v. United States, 60 Fed. Cl. 558, 565 (2004) (citing Theisen Vending Co. v. United States, 58 Fed. Cl. 194, 198 (2003)).

The purpose of Rule 56(d) is to avoid premature motions for summary judgment and prevent the non-movant from being "railroaded" by a premature motion. See Celotex Corp., 477 U.S. at 326. The Rule "allows a summary judgment motion to be denied, or the hearing on the

motion to be continued, if the nonmoving party has not had an opportunity to make full discovery." Id.

In this case, Plaintiff is not being "railroaded"; it has had the opportunity for full discovery and then some. Moreover, when the government filed its motion for summary judgment over a year ago, on September 30, 2016, it did so pursuant to a scheduling order that the parties proposed. See ECF Nos. 174, 176. At that point, more than five years had elapsed since Plaintiff filed its complaint and there had been three or four years of discovery, including the filing and disposition of numerous discovery motions. In short, Plaintiff's current RCFC 56(d) motion does not fit within the purpose of that rule.

Second, RCFC 56(d) provides the Court the authority to defer or deny a motion or issue any other appropriate order including allowing discovery, where "a nonmovant shows . . . that, for specified reasons, it cannot present facts essential to justify its opposition." Plaintiff, however, has already presented facts in support of its opposition, albeit unsuccessfully. Indeed Plaintiff opposed the government's motion for summary judgment with lengthy briefs and extensive affidavits, declarations, and exhibits. See, e.g., ECF Nos. 182–85. Plaintiff thus did not "respond to a motion for summary judgment by filing a motion under RCFC 56(d)." Clear Creek Cmty. Servs. Dist. v. United States, 100 Fed. Cl. 78, 82 (2011) (emphasis added). Rather, Plaintiff fully briefed its opposition and then waited five months after briefing was completed to file a motion under RCFC 56(d).

Plaintiff relies upon the recent TIGTA report in support of its request to reopen discovery at this late date. In the report, TIGTA found instances where the IRS had not conducted an adequate search for records generated by former employees and one instance where the IRS had inaccurately reported to a court that a former employee's laptop was unavailable. But those findings have no bearing on the government's refusal to supply Plaintiff with the workload logs it now seeks. In fact, Plaintiff was made aware of the existence of IRS special agent workload logs and the government's ability to produce them well before the summary judgment motions were fully briefed.

Thus, on November 13, 2015, the government produced SA [***]'s workload logs to counsel for CI. T. Scott Tufts' Aff. App. 21, ECF No. 159-22. Then, on February 1, 2016, Plaintiff's counsel requested from the government the workload logs that it now seeks for the other special agents. T. Scott Tufts' Aff. App. 24, ECF No. 159-25. The government, however, refused to produce the logs, arguing that they were not covered by CI's document production requests or were otherwise not likely to lead to discoverable evidence and that discovery had already closed. See id. Plaintiff did not move to compel their production. Instead, Plaintiff filed a motion for sanctions for spoliation in April 2016, contending that the IRS should be sanctioned for its alleged spoliation of an audio tape, chain of custody documents for the audio tape, a witness interview report, and documents related to the transfer of CI's case from the criminal division to the civil function. See ECF No. 161.[26]

---

[26] In the motion for sanctions for spoliation Plaintiff several times mentioned that the government had refused to produce the workload logs of other special agents. See, e.g., Confidential Informant 59-05071's Mot. for Spoliation of Evid. & for Sanctions at 6, 13–14, 19,

In any event, the Court questions the significance of the workload logs to Plaintiffs' claims in this case. Those logs do not contain substantive investigative information; rather, they are essentially time sheets which record tasks completed. Plaintiff contends nonetheless that the workload logs will give the Court a "fuller picture" of what occurred in the case and might produce evidence that supports Plaintiff's claim that the IRS has propagated a "false narrative" regarding its handling of CI's disclosures. The notion of a "false narrative," however, has no support in the record, and Plaintiff fails to explain how the allegedly "false narrative" relates to its claims that the IRS acted with a specific intent to deny CI the fruits of the Reward Agreement when it pressured CI (unsuccessfully) to modify its terms.

As to computer hardware or electronic information relating to UPM [***] and SA [***], Plaintiff argues that it "desires to obtain electronic documentation showing direction coming from superiors in trying to get Special Agent [***] to get [CI] to agree to the making of a change to the . . . Reward Agreement." Id. at 16–17. But Plaintiff has deposed SA [***] twice, and has also deposed UPM [***] and IRS supervisors. There is nothing in their testimony that supports the existence of such undiscovered electronic information on laptops or other electronic devices. Further, any such evidence would be cumulative, as Plaintiff has already submitted copies of emails and deposition testimony which show that UPM [***], SA [***], and others at the IRS made efforts to pressure CI to agree to modify the Reward Agreement, and the IRS does not deny that such efforts were made. Accordingly, for all these reasons, CI's motion for relief pursuant to RCFC 56(d) or RCFC 16(b)(4) is **DENIED**.

## CONCLUSION

For the reasons set forth above, CI's motion for the Court to take judicial notice (ECF No. 199) is **DENIED**. The government's motion for summary judgment with respect to Counts I and II of the third amended complaint is **GRANTED**. The government's motion to dismiss with respect to Count III is **GRANTED** and Count III of the third amended complaint is **DISMISSED without prejudice**. Plaintiff's motion for partial summary judgment is **DENIED**. Plaintiff's motion for relief from the protective order is **GRANTED** and Plaintiff's motion for judicial notice and limited discovery relief is **GRANTED-IN-PART** and **DENIED-IN-PART**. The Clerk is directed to enter judgment accordingly. Each side shall bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge

---

ECF No. 161. But Plaintiff did not request that the Court compel their production, focusing instead on its claims that other evidence had been destroyed.